RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE __8_ / _9_ / _11_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

VERSUS

BOBBY D. CURTIS

CIVIL ACTION
SECTION "P"
1:08-CR-00207

JUDGE DEE D. DRELL
MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a motion to vacate, set aside, or correct sentence filed pursuant to 28 U.S.C. § 2255 by Bobby D. Curtis ("Curtis") on October 18, 2010. Curtis is contesting his conviction and sentence, entered pursuant to a guilty plea in the United States District Court for the Western District of Louisiana in Alexandria, on one count of concealment of bankruptcy estate assets valued at $942,006.38.[1] Curtis was sentenced to 37 months imprisonment and restitution in the amount of $355,119, the amount he allegedly owed his creditors. See U.S. v. Curtis, 379 Fed.Appx. 344 (5th Cir. 2010).

The sole ground for relief raised by Curtis in his motion is whether he had ineffective assistance of counsel due to counsel's:

(1) failure to research the relevant statutes prior to the case, thereby allowing Curtis to plead guilty to elements of the offense which lacked the prerequisite fraudulent intent;

(2) failure to investigate and research the circumstances surrounding the case;

---

[1] Curtis was charged in the indictment with a violation of 18 U.S.C. § 152(1), which makes it a crime to "knowingly and fraudulently" conceal assets in a bankruptcy proceeding.

(3) allowing Curtis to do his own legal research and draft critical motions, which were submitted to the court with only cosmetic changes (motion to withdraw guilty plea, sentencing memorandum, and addendum to the sentencing memorandum);

(4) failure to call expert witnesses, including Curtis' bankruptcy attorney;

(5) failure to research the statute of limitations and argue it effectively to the court;

(6) failure to ask for a downward departure based on Booker, with the help of expert witnesses at sentencing; *and*

(7) advising Curtis that his maximum exposure under the sentencing guidelines was six to twelve months, for a 25 month disparity between his advice and the sentence imposed.

Law and Analysis

## 1. The Law of §2255 Actions

Relief under 28 U.S.C. §2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.  Nonconstitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding.  U.S. v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).  Also, U.S. v. Ressler, 54 F.3d 257 (5th Cir. 1995).  A collateral challenge may not do service for an appeal. After conviction and exhaustion and waiver of any right to appeal, the federal courts are entitled to presume that the defendant stands fairly and finally convicted.  U.S. v. Shaid, 937 F.2d 228, 231-32 (5th Cir. 1991), cert. den., 502 U.S. 1076, 112 S.Ct. 978, 117 L.Ed.2d 141 (1992).  Even if a defendant raises a constitutional error, he may not raise an issue for the first time on collateral

2

review without showing both cause for his procedural default and actual prejudice resulting from the error.  U.S. v. Mimms, 43 F.3d 217, 219 (5th Cir. 1995), and cases cited therein.

Cause is demonstrated by showing objective external factors which prevented the petitioner from having raised the instant claim previously, and actual prejudice resulting from the error.  If the petitioner cannot show cause, the failure to raise the claim in an earlier proceeding may nonetheless be excused if the petitioner can show that a fundamental miscarriage of justice would result from a failure to entertain the claim, i.e. the petitioner must make a colorable showing of actual innocence.  U.S. v. Flores, 981 F.2d 231, (5th Cir. 1994).  Also, McCleskey v. Zant, 499 U.S. 467, 495, 111 S.Ct. 1454, 1471, 113 L.Ed.2d 517 (1991).  Absent exceptional circumstances, establishment of ineffective assistance of counsel satisfies cause and prejudice.  U.S. v. Acklen, 47 F.3d 739, 742 (5th Cir. 1995).

2.  The Law for Effective Assistance of Counsel

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must show that his counsel's performance was both deficient (i.e., that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (i.e., that errors by counsel "actually had an adverse effect on the defense).  The former component of the test authorizes

3

only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Anderson v. Collins, 18 F.3d 1208, 1215 (5th Cir. 1994), and cases cited therein.  Also, U.S. v. Segler, 37 F.3d 1131, 1136 (5th Cir. 1994).

In showing he was rendered ineffective assistance of counsel in regard to his sentence, Curtis must additionally show that there was a "reasonable probability that but for trial counsel's errors the defendant's non-capital sentence would have been significantly less harsh; relevant factors are the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances.  U.S. v. Segler, 37 F.3d at 1136.

3. The E-Rate Program

In 1983, Congress created the Universal Service System to make telephone service available to all Americans, regardless of geographic location, at a reasonable cost.  In 1996, the Telecommunications Act revised the Universal Service System (commonly known as the E-Rate Program) by expanding both the base of companies that contributed to offset communications service rates

4

and the category of customers who benefitted from discounts.   One
provision of the Telecommunications Act specifies that, upon
request, individual communications carriers must provide Internet
service to schools and libraries at affordable rates (the E-Rate
Program).  The total sum of the resulting discount is reimbursed by
the E-Rate program.  The Federal Communications Commission created
the Universal Service Administrative Company ("USAC") to implement
and administer the E-Rate Program.   USAC, in turn, created the
Schools and Libraries Division ("SLD").  Data Research Corp. v. Rey
Hernandez, 261 F.Supp. 61, 64-65 (D.P.R. 2003).   Also, Alpha
Telecommunications, Inc. v. International Business Machines, 194
Fed.Appx. 385, 386 (6th Cir. 2006), cert. den., 550 U.S. 980, 127
S.Ct. 2906 (2007).  In summary, the federal E-Rate Program provides
subsidies to schools and libraries for Internet access and other
telecommunications services.  U.S. v. Hansen, 2010 WL 431436, *1
(W.D.Mich. 2010).

4. Curtis' Charge and Conviction

     Gen-I-Tech, Inc. is a corporation founded by Curtis to perform
contract work installing the lines and other equipment necessary to
run computers in public schools and libraries, pursuant to the
federal E-Rate Program.

     On May 24, 2002, Curtis filed for personal bankruptcy under
Chapter 13, and included his Gen-I-Tech, Inc. stock, valued at
$2000, in his list of personal assets.  Curtis' bankruptcy attorney

was Rocky Willson.[2]   On August 29, 2002, Curtis converted to a Chapter 11 bankruptcy, and on February 12, 2002, he converted to a Chapter 7 bankruptcy.   On July 23, 2003, Curtis received a discharge in his personal bankruptcy under Chapter 7.

On July 23, 2008, Curtis was charged by indictment with bankruptcy fraud.   Specifically, Curtis was charged with failing to reveal the assets of Gen-I-Tech, Inc. during his personal bankruptcy proceedings.   The assets alleged to have been concealed were four contracts Gen-I-Tech was awarded, as a contractor, pursuant to the Federal E-Rate program-the Westside Alternative School contract, the Youth Challenge Program contract, the Job Challenge Program contract, and the Lafayette Christian Academy contract.   The Westside contract was approved and funded by the E-Rate Program prior to Curtis' discharge in personal bankruptcy.   The other three contracts, Youth Challenge, Job Challenge, and Lafayette Christian Academy, were approved and funded by the E-Rate Program after Curtis' discharge in personal bankruptcy.   The gross amounts Gen-I-Tech, Inc. was paid pursuant to the contracts is $942,006.38; that is the amount Curtis was alleged to have concealed from his personal bankruptcy creditors.

Curtis pleaded guilty in January 2009, apparently believing he was pleading guilty to "concealing" Gen-I-Tech's contract for work at the Westside Alternative School, but he discovered at the plea hearing that he was pleading guilty to concealing the Youth

---

[2] Willson is both an experienced bankruptcy attorney and an experienced bankruptcy trustee.

Challenge, Job Challenge, and Lafayette Christian Academy contracts, as well.  It was determined at the March 2011 hearing on the Section 2255 motion that Curtis' attorney, Allen Smith, had not reviewed any discovery prior to Curtis' guilty plea; it was not determined whether Smith had actually received any discovery from the prosecutor at that point.  On May 7, 2009, a hearing was held on Curtis motion to withdraw his guilty plea on the grounds that the indictment was untimely and he had not entered his guilty plea knowingly.  Curtis' motion to withdraw his guilty plea was denied, and he was sentenced on May 21, 2009.

5. Proceedings Before the District Judge

There were three hearings held by the district judge in this case-a plea hearing in January 2009 (Doc. 24), a hearing on Curtis' motion to withdraw his guilty plea on May 7, 2009 (Doc. 32), and a sentencing hearing on May 21, 2009 (Doc. 34).[3]

1.

At Curtis' January 2009 plea hearing (Doc. 43), the FBI case agent testified that Curtis filed his bankruptcy petition under Chapter 13 on May 24, 2002, converted to a Chapter 11 in August 2002, and converted to a Chapter 7 in February 2003; he was discharged in bankruptcy on July 23, 2003 (Doc. 43, p. 19).  In that bankruptcy petition, Curtis listed the value of his stock in Gen-I-Tech, his company, as $2000 (Doc. 43, pp. 19-20).  The agent further testified that, in a subsequent bankruptcy proceeding initiated in

---

[3] There was also a hearing held by the undersigned Magistrate Judge in March 2011 on Curtis' Section 2255 motion.

August 2004, Curtis listed the value of his Gen-I-Tech stock as $70,000 (Doc. 43, p. 20).

FBI case Agent Pamela McCarthy testified that Curtis had undervalued his Gen-I-Tech stock in the bankruptcy proceeding initiated in May 2002 due to outstanding contracts, some of which were awarded and some of which he hoped would be awarded (Doc. 43, pp. 20-21). Curtis' business, Gen-I-Tech, brought technology to schools and libraries in rural communities that met the qualifications for federal contracts under the federal E-rate program (Doc. 43, p. 21).

FBI Agent McCarthy testified that all services by Gen-I-Tech were completed at the Westside Alternative School in October 2002 and billed by Gen-I-Tech; payments were made by E-rate to Gen-I-Tech on March 31, 2002, May 8, 2003, June 19, 2003, and June 30, 2003, totaling $191,800.72 (Doc. 43, pp. 21-22). Agent McCarthy testified that the contract was in place and Gen-I-Tech received payments on the contract prior to Curtis' discharge on July 23, 2003 (Doc. 43, p. 22).

Agent McCarthy testified that Gen-I-Tech also had contracts with the Youth Challenge Program, for which it was paid $235,221.30, the Job Challenge Program, for which it was paid over $360,000, and the Lafayette Christian Academy, for which it was paid over $106,000 (Doc. 43, Tr. pp. 22-23). Dates for those contracts and payments were not established at the hearing. Agent McCarthy testified that Curtis had told her he was aware of the pending E-rate contracts, which he believed would be funded (Doc. 43, p. 24). Agent McCarthy

8

further testified that Curtis admitted to her the $2000 valuation on Gen-I-Tech was underestimated (Doc. 43, p. 24). Agent McCarthy essentially admitted that, although a contract is awarded, it must still be approved by the federal E-Rate Program, and stated that Curtis told her he believed the contracts would be approved (Doc. 43, pp. 27-28). Agent McCarthy testified she did not know what the value of Gen-I-Tech actually was, but that it was more than $2000 (Doc. 43, p. 28).[4]

Curtis testified that the contract on Westside Alternative School was executed and paid before his discharge in bankruptcy, but that the other contracts were not approved until afterward (Doc. 43, p. 29). Curtis testified that the schools can back out of the "contracts" at any time before approval and the federal government can refuse to approve the "contracts," which happened with one of the contracts (Doc. 43, pp. 29-30). At that point, the District Judge asked Curtis whether he understood the elements of the offense and still wished to plead guilty, and entered the guilty plea (Doc. 43, pp. 30-31).

2.

At the May 7, 2009 hearing on Curtis' motion to withdraw his guilty plea (Doc. 44), Curtis argued that some of the "E contracts" the government accused him of concealing were nothing more than unenforceable applications prior to his discharge in bankruptcy; the forms were titled "application" (Doc. 44, pp. 11-12). Curtis

---

[4] There was no testimony by McCarthy as to the assets or liabilities of Gen-I-Tech, Inc. and no balance sheet was presented as evidence of the company's value.

disclosed the applications to his bankruptcy attorney, Rocky Willson; there is no evidence as to whether Curtis' E-rate applications were not included in the bankruptcy petition based on advice from Attorney Willson (Doc. 44, p. 17). Curtis' criminal defense attorney, Smith, admitted at the hearing that he perhaps should have subpoenaed Attorney Willson to testify, but he did not (Doc. 44, p. 17). Smith "agreed" with the District Judge that regardless of why the E-rate applications were never included in the list of assets during bankruptcy, the *legal fault* lay with Curtis and not Attorney Willson (Doc. 44, p. 16).

Kimberly Allen Bumstead testified as the chief investigator for the Universal Service Fund; Bumstead testified that he investigates fraud within the E-rate program (Doc. 44, pp. 46-47). Bumstead testified the "funding year" refers to the year a Funding Commitment Decision Letter ("FCDL") issued for the project by the Universal Service Administrative Company (which administers the E-Rate Program for the FCC). The funding year for the Lafayette Christian Academy, Youth Challenge Program, Gillis Long Center and Job Challenge Program projects was 2003, as shown in Government Exhibit 1 (Doc. 44), but there is no evidence as to when in 2003 the FCDL was issued-whether before or after Curtis' discharge in bankruptcy (Doc. 44, pp. 48, 51). Westside Alternative School project had a funding year of 2002 (Doc. 44, p. 50 and Ex. 1).

On cross-examination, Curtis' defense counsel asked Bumstead about the payments disbursed to Gen-I-Tech for its work on these projects (Doc. 44, pp. 54-55), but not about the dates the funding

commitment letters were issued.  Bumstead testified that the local
match payments are ten to eighty percent of the project amounts
(Doc. 44, p. 54).  However, Bumstead also testified that he assumed
the local match amounts were actually paid and could not at that
time refute any allegations by Curtis that the local match money was
not paid (Doc. 44, p. 57-58).  Bumstead testified that most of the
work Gen-I-Tech contracted to do was to run internet access lines
in the walls, into which pre-existing computers were plugged (Doc.
44, pp. 60-61).  Bumstead testified that, before the applicant (the
school or library) could get approved or denied by the E-Rate
Program, it had to have an agreement with a vendor/service provider
for the work to be done (Doc. 44, pp. 65, 69).  Bumstead testified
that the agreement was supposed to be an enforceable contract (Doc.
44, pp. 59, 69).

     The trustee for Curtis' bankruptcy estate, Mark Sutton, also
testified on behalf of the government (Doc. 44, pp. 71-72).  Sutton
testified that there were never any amendments, after the original
filing, made to the list of assets in Curtis' bankruptcy petition
(Doc. 44, p. 72); Sutton became involved in Curtis' case after he
converted to a Chapter 7 (Doc. 44, pp. 72-73).

     Sutton further testified there was a  creditors' meeting, but
no one showed up for it except Curtis, Sutton, and Curtis' attorney
(Doc. 44, p. 73).  Sutton testified that, at the creditors' meeting,
Curtis told him the only assets of Gen-I-Tech were a computer and
a truck with over 200,000 miles on it, and that Curtis was employed
as a consultant by Gen-I-Tech, for which he was paid $4000/month

(Doc. 44, Tr. pp. 73-74).

Sutton testified that he concluded Curtis had a no-asset bankruptcy case (Doc. 44, p. 74). Sutton testified that he never saw or was told anything about the existence of E-Rate Program contracts (Doc. 44, pp. 75-76). Curtis' attorney read the portions of the contracts between Curtis and the schools which stipulated they could be terminated by either party at any time and that they were "null and void" if unfunded or, if only partially funded, they were only good up to that amount (Doc. 44, p. 81). Sutton then testified that he was not sure what value such contracts had, but supposed that a buyer would have to weigh the risks inherent in such contracts and they would be worth what someone was willing to pay for them (Doc. 44, p. 82).

3.

At the May 21, 2009 sentencing, in overruling an objection by the defense to the guideline sentencing calculation, the court held that Curtis failed to disclose at least $942,000 to his creditors, based on calculations of amounts paid under the Gen-I-Tech contracts to Gen-I-Tech (Doc. 45, Tr. pp. 5-9). Overruling further objection by the defense to the guideline sentencing calculation, the court calculated the number of Curtis's creditors by counting the number of Gen-I-Tech's creditors (Doc. 45, pp. 9-12).

In pronouncing sentence, the district judge stated that the contracts were "clearly the property of the bankrupt estate... and should have been disclosed in the bankruptcy" (Doc. 45, Tr. p. 30). The court further noted the trustee's testimony that he could have

12

sold the company, Gen-I-Tech, for a substantial amount of money had he known about the pre-existing contracts (Doc. 45, Tr. p. 30). Finally, the court stated that it was not appropriate to consider what Curtis' bankruptcy attorney, Rocky Willson, advised him to do since there was no testimony from Willson in the record (Doc. 45, p. 31). Curtis was sentenced to 37 months imprisonment, restitution of $355,119, and three years supervised release with special conditions (Doc. 45, Tr. pp. 31-33).

## 5. Curtis' Ineffective Assistance of Counsel Claims

Curtis contends his attorney failed to research the relevant statutes, thereby allowing Curtis to plead guilty to elements of the offense which lacked the requisite fraudulent intent, failed to investigate and research the circumstances surrounding the case, and failed to call expert witnesses, including Curtis' bankruptcy attorney. Curtis also contends his attorney's failure to research the relevant statutes prior to the case resulted in Curtis pleading guilty to an offense for which the statute of limitations had run and to an offense for which he lacked the prerequisite fraudulent intent.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 1052, 2066 (1984). A determination of whether an investigation is reasonably adequate depends upon a variety of factors, including the number of issues in the case, the relative complexity of those

issues, the strength of the Government's case, and the overall strategy of trial counsel. Baldwin v. Maggio, 704 F.2d 1325, 1333 (5th Cir. 1983), cert. den., 467 U.S. 1220, 104 S.Ct. 1669 (1984). However, bare allegations do not suffice. A defendant or petitioner who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). Under Strickland, even where trial counsel has failed to adequately investigate a case, a defendant must demonstrate that he has been prejudiced by his counsel's failure. See Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987). To show prejudice, the petitioner must prove that an alleged breach of his attorney's duty to investigate resulted in an actual and substantial disadvantage to the course of his defense. Baldwin, 704 F.2d at 1333.

The individual issues and arguments raised by Curtis in his failure to investigate claim are discussed separately below.

### Statute of Limitation Defense

Foremost, Curtis contends his trial counsel was ineffective for failing to research the statute of limitations, failing to advise Curtis about it correctly prior to entry of his guilty plea, and failing to argue it correctly and effectively to the court.

Curtis initially filed for personal bankruptcy on May 24, 2002 under Chapter 13, converted to Chapter 11 (reorganization), then converted again to Chapter 7 (liquidation), and was discharged on

14

July 23, 2003.  See In re Curtis, No. 02-80849 (Bankr.W.D.La.).  On July 23, 2008, Curtis was charged by indictment with bankruptcy fraud through concealment of assets (Doc. 1), a charge to which Curtis pleaded guilty.

After pleading guilty, but before sentencing, Curtis filed a motion to withdraw his guilty plea (Docs. 30, 31).  At the May 7, 2009 hearing, Curtis' attorney, Smith, stated to the court that, before pleading guilty, Curtis had asked Smith about the statute of limitation and Smith had given Curtis bad advice, mistakenly telling him that the statute of limitation had not run on his offense. Smith argued that, but for his erroneous advice, Curtis would not have entered a guilty plea and, therefore, Curtis should be allowed to withdraw his plea (Docs. 2, 31, 44).  The court denied Curtis' motion (Doc. 32).

In Toussie v. U.S., 397 U.S. 112, 113, 90 S.Ct. 858, 860 (1970), the Supreme Court explained that the purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions.  Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

In Curtis' case, the court applied the five year limitation period in 18 U.S.C. § 3284 (Doc. 44), which states, "the concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge." Thus, the limitation period for initiating prosecution for bankruptcy fraud begins to run on the date of discharge (or denial of discharge).[5]  See U.S. v. Guglielmini, 425 F.2d 439 (2d Cir. 1970), cert. den., 400 U.S. 820, 91 S.Ct. 38 (1970), citing U.S. v. Fraidin, 63 F.Supp. 271, 285 (D.Md. 1945).  Also, U.S. v. Dolan, 120 F.3d 856, 867-868 (8th Cir. 1997); Winslow v. U.S., 216 F.2d 912, 915 (9th Cir. 1954), cert. den., 349 U.S. 922, 75 S.Ct. 662 (1955).

In Curtis' case, the first day of the limitation period is the date of his discharge, July 23, 2003.  Therefore, the last date of the five year limitation period is July 22, 2008.  Therefore, the return of Curtis' indictment on July 23, 2008 was one day too late

---

[5] According to the Oxford English Dictionary (2010 Oxford University Press) at http://www.oed.com, "until" means "With reference to time: Onward till (a time specified or indicated); up to the time of (an action, occurrence, etc.)."  According to the Merriam-Webster Dictionary (2011 Merriam-Webster, Inc.) at http://www.merriam-webster.com, "until" means "to" or "before." A continuing offense is the type of crime which is committed over a span of time as, for example, a conspiracy.  As to period of statute of limitation, the last act of the offense controls for commencement of the period.  U.S. v. Gilbert, 136 F.3d 1451, 1453 n.4 (11th Cir. 1998), citing Black's Law Dictionary 291 (5th ed. 1979).  Since bankruptcy fraud is a continuing offense until discharge, the last day of the continuing offense is the day before (or up to) the date of discharge or denial of discharge in bankruptcy.

and thus untimely.

Curtis testified at the hearing in March 2011 that he raised the potential defense of statute of limitation with his criminal defense attorney, Smith, who told him the indictment was, in fact, timely.  Based on that advice, Curtis pleaded guilty to the indictment.  Both Curtis and Smith testified that, subsequently, attorney Smith changed his mind about the limitation period and filed a motion to withdraw the guilty plea on the basis that the indictment was untimely and he had mis-advised his client as to that possible defense.  The district judge denied the motion to withdraw the guilty plea, citing waste of judicial resources and waiver of defenses as his reasons (Doc. 32).

Since the indictment against Curtis was filed one day after the last day of the five year limitation period, Curtis' attorney erred in advising Curtis that the indictment against him was timely and in advising him he should plead guilty to the indictment.  According to the testimony, Curtis would not have pleaded guilty but for attorney Smith's erroneous calculation of the limitation period and his advice to Curtis that he should plead guilty.  Correctly calculating the limitation period for returning an indictment falls within the scope of reasonably effective assistance with a criminal defense under prevailing professional norms.  Moreover, the error in the calculation of the statute of limitation led to advising Curtis to plead guilty to an untimely indictment, advice which Curtis followed.  Thus, the error clearly had such an adverse effect on Curtis' defense that Curtis has overcome the presumption that his

17

attorney might be considered sound trial strategy.  It is never sound trial strategy to forgo a complete defense to an indictment. See U.S. v. Hansel, 70 F.3d 6 (2d Cir. 1995)("[C]ounsel's failure to object to the time-barred counts is unaccountable in the circumstances, and cannot 'be considered sound trial strategy.' ...Hansel's prejudice is that he pled guilty to two time-barred counts that would have been dismissed, if his attorney had acted competently. ...Hansel's waiver of the time-bar defense cannot be deemed knowing and intelligent: we may assume that he would not have pled guilty to counts that he knew to be time-barred."). Therefore, Curtis has shown that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Therefore, Curtis has shown that he had ineffective assistance of counsel and that, but for his counsel's erroneous advice as to the statute of limitation, he would not have pleaded guilty.

### Defenses as to Fraudulent Intent

Curtis contends his attorney failed to properly investigate and raise the defense of lack of fraudulent intent.  This defense applied to all four contracts, but most particularly to the Westside Alternative School contract.

Curtis alleges his attorney failed to interview the bankruptcy attorney, Willson, to discover whether Curtis had any fraudulent intent, to determine whether Curtis had disclosed Gen-I-Tech's then-existing contract (Westside Alternative School) and potential contracts to Willson, to find out why neither Willson nor Curtis disclosed Curtis' contract payments to the bankruptcy trustee, and

18

to find out what advice Willson gave Curtis concerning the disclosure of assets, contracts, payments and potential contracts, and whether Curtis relied on Willson's advice.

Curtis pleaded guilty to 18 U.S.C. § 152(1), concealment of bankruptcy estate assets from creditors or the United States Trustee.  A bankrupt's intentional untruth in a matter material to the issue which is itself material constitutes false testimony knowingly and fraudulently given, and intent is proved by inference. In re Slocum, 22 F.2d 282, 285-286 (2dh Cir. 1927) (false answers given to creditors in Title 7 proceeding).  However, *a party who acts in good faith reliance on the advice of an attorney does not have the fraudulent intent necessary to support a conviction for bankruptcy fraud*.[6]  U.S. v. Herring, 72 Fed.Appx. 57, 65 (5th Cir. 2003), cert. den., 540 U.S. 1024, 124 S.Ct. 583 (2003)(bankruptcy fraud case), citing U.S. v. West, 22 F.3d 586, 598 n. 34 (5th Cir. 1994), cert. den., 513 U.S. 1020, 115 S.Ct. 584 (1994)(bankruptcy

---

[6] At the district court hearing (Doc. 44, pp. 15-16), defense counsel argued that the letters from Curtis' bankruptcy attorney showed Curtis had disclosed the contracts and payments to his bankruptcy attorney.  However, the district judge stated, "Yeah, but the issue, as I appreciate it, fleshed out in the presentence report, was that there was not disclosure on the applications -- excuse me -- the bankruptcy schedules.  He took the stand at least twice, and perhaps three times, and verified on the stand, for the Court, that those schedules were accurate. In other words, it isn't Mr. Willson's fraud.  I'm sure your client is not accusing him of fraud.... It's his, your client's obligation, to say, yeah, I've looked at these schedules and they're correct.  It's kind of like your tax return.  If your tax preparer is not --... Yah.  He doesn't go to jail for you."
However, the law is clear that, if your bankruptcy attorney advises you not to include something on the asset schedule, and you follow that advice to your detriment, you are absolved of having the specific intent to commit fraud.  Herring, 72 Fed.Appx. at 65, and cases cited therein.

fraud case).   Also, U.S. v. Smithson, 49 F.3d 138, 142 (5th Cir. 1995)(bankruptcy fraud case).

Curtis contends he lacked the element of fraudulent intent and he relied on his bankruptcy attorney in filling out his petition and attached schedules.   Curtis argues his criminal defense attorney should have researched and discovered that defense.

1.

First, it is noted that Curtis filed for personal bankruptcy. Therefore, he was only obligated to list his personal assets in his bankruptcy petition.   One of Curtis' personal assets, which he listed, was his shares of Gen-I-Tech, Inc. stock.   Curtis pled guilty only to failing to disclose assets under 18 U.S.C. 152(1) (Doc. 24).   Curtis did not plead guilty to undervaluing assets under Section 152(2).   Nevertheless, all of the focus in the case and at the guilty plea concerned valuation of the Gen-I-Tech stock and, in the alternative, failure to disclose Gen-I-Tech's corporate assets, the contracts, even though Curtis did not have an obligation to disclose corporate assets in his personal bankruptcy.   Since Curtis disclosed his personal assets, the stock, in his personal bankruptcy, that should end this discussion.   However, for completeness, fraudulent intent and valuation are discussed below.

Attorney Willson admitted at the March 2011 hearing that it was he who convinced Curtis to list his Gen-I-Tech stock at $2000 in the bankruptcy petition.   Since Curtis relied on his attorney's advice in listing his assets and valuing his stock, Curtis did not have the specific intent to commit bankruptcy fraud.   Had defense attorney

20

Allen talked to bankruptcy attorney Willson about the case, Allen
would have easily and quickly learned of that defense and the
relevant law.  Willson's testimony at Curtis' criminal proceedings
would have provided Curtis with a complete defense against fraud.
Allen admitted several times at the Section 2255 hearing that he
never talked to attorney Willson about the criminal case or about
Curtis' bankruptcy case, even though Allen knew Willson personally
and saw him frequently.

It is also noted that Willson testified that the only relevant
value of Curtis' stock in Gen-I-Tech, Inc. was the value it had on
the date Curtis originally filed for bankruptcy, or May 25, 2002,
pursuant to 11 U.S.C. § 541.  Willson explained this statute as the
"snapshot theory" because it states a debtor's assets are valued as
of the date of filing the petition in bankruptcy and, outside of a
few exceptions, a subsequent increase or decrease in the value of
the assets of the bankruptcy estate is irrelevant.  Willson further
explained that 11 U.S.C. § 341 makes subsequent conversion to a
different chapter in bankruptcy (such as Curtis' conversions from
Chapter 13 to Chapter 11 to Chapter 7) retroactive to the date of
the original bankruptcy petition for purposes of Section 541, or the
snapshot theory.   Therefore, a conversion does not require a
petition that includes a new asset list and a new valuation of
assets.

Since Curtis relied on Willson's advice in valuing his Gen-I-
Tech, Inc. stock, Curtis lacked the specific intent to commit fraud
by undervaluing it.  Curtis has shown that, but for defense attorney

21

Smith's failure to contact his bankruptcy attorney, Willson, Smith would have known that Curtis had a complete defense to the charge and the result of the proceeding would have been different. Therefore, Curtis had ineffective assistance of counsel in this respect, also.

2.

Curtis also argues that he did not have the specific intent to fraudulently conceal Gen-I-Tech's Westside Alternative School contract from the bankruptcy trustee and his personal bankruptcy estate.

First, it is noted that Curtis filed for a personal bankruptcy, in which he was obligated to list his personal assets. The Westside Alternative School contract (as well as the other three contracts to be discussed) was an asset of Gen-I-Tech, Inc., and not one of Curtis' personal assets.

At the Section 2255 hearing held in March 2011, Curtis' bankruptcy attorney, Rocky Willson, an attorney with a specialty certification in bankruptcy law who also serves as a Chapter 7 trustee, testified that Curtis had no obligation to reveal the assets of the Gen-I-Tech, Inc. corporation in his personal bankruptcy; Curtis only had an obligation to reveal the value of the corporate stock Curtis held as a personal asset. Willson explained that, although he had marked the box on Curtis' petition for "d/b/a Gen-I-Tech, Inc.," that was done at the insistence of the Chapter 13 trustee on the case who, Willson asserted, was not an attorney, did not understand the legal implications of it, and erroneously

22

insisted on it in every case despite the fact that Gen-I-Tech was incorporated and a separate legal entity from Bobby Curtis, and Curtis (with his wife) was taking a personal bankruptcy. This testimony was relevant since Curtis was charged with fraud for deliberate undervaluation of his Gen-I-Tech, Inc. stock, but was found guilty of bankruptcy fraud for failure to disclose the Gen-I-Tech, Inc. contracts to the bankruptcy trustee and his creditors; the district court stated that the contracts were "clearly the property of the bankrupt estate" (Doc. 45, Tr. p. 30) or, in other words, Curtis' personal property. No distinction was made between Curtis' personal property (the Gen-I-Tech stock) and property owned by Gen-I-Tech, Inc. (the contracts) at Curtis' bankruptcy fraud proceedings.

Curtis contends that, when he was interviewed by the FBI agent (Pamela McCarthy) in June 2008, he did not have any clear recollection of his bankruptcy filings in 2003,[7] so he agreed with the agent that he likely had not disclosed the funds he received from the Westside Alternative School. Curtis further contends that, on April 24, 2009, he discovered correspondence with his bankruptcy attorney, dated after conversion to a Chapter 7 proceeding but prior to discharge, which showed he had not concealed assets (See Doc. 30, Ex. B). Curtis contends the letters show the bankruptcy attorney, Willson, corresponded with his mortgage company about paying the

---

[7] Curtis testified at the Section 2255 hearing that there were several tragedies in Curtis' family in the intervening years, including Curtis' loss of a son, a brother, two nephews, and his mother.

past-due amount on his loan with proceeds from the Westside Alternative School contract, which began arriving prior to discharge. Curtis contends he is "almost certain" attorney Willson informed the bankruptcy trustee of that arrangement. Willson mailed the first check from the contract to the mortgagor, but the check was returned due to an error by the mortgage company as to the amount owed (Doc. 30, Ex. B). Willson then sent Curtis a letter dated June 2, 2003, informing him of the returned check and the corrected pay-off amount.

Willson testified at the 2011 Section 2255 hearing that he had no recollection of the Gen-I-Tech contracts or where Curtis got the money to pay his mortgage, and further testified that he did not ask where the money came from and did not believe it needed to be included on the asset list since it was received after the bankruptcy petition was initially filed, citing 11 U.S.C. §§ 341, 541 and the "snapshot theory."

Curtis contends the attempt and intent to pay one of his creditors with money received from the Westside Alternative School project, and his reliance on the advice of counsel, proves he did not conceal those funds or have the fraudulent intent to conceal those funds. Although the bankruptcy trustee, Mark Sutton, testified that those funds were never included in his list of assets or revealed to the trustee or the creditors at the creditors' meeting (See Doc. 44, p. 72), he admitted at the Section 2255 hearing that he would have had to seek the advice of counsel to determine what, if anything, he could do with the Gen-I-Tech

24

contracts.   Curtis argues that, according to Willson, these contracts did not have to be disclosed to Sutton because the contracts were not Curtis' personal assets.

At the Section 2255 hearing before the undersigned, Curtis' defense attorney, Smith, admitted he never contacted either Curtis' bankruptcy attorney or the bankruptcy trustee in order to investigate the case.

The Westside Alternative School contract was  approved and enforceable as a contract before Curtis' discharge in bankruptcy. The Respondent filed a chart in the Section 2255 proceeding which shows the Form 471 was filed on January 17, 2002 by the school with the E-Rate Program to apply for federal funding for the Westside Alternative School project (following selection of Curtis as the service provider).  The Respondent's evidence further shows the federal funding commitment for the Westside Alternative School contract was dated October 8, 2002.  Curtis testified that no work was ever performed before funding was approved since it was possible that funding would not be approved and the contract would then be rescinded.

Thus, the evidence shows that Curtis performed the work on the Westside contract after he filed for bankruptcy on May 25, 2002; the contract and funding were not approved by the federal E-Rate program until October 2002, so work was not performed until after that date. Moreover, the Respondent's evidence shows payments on the Westside contract were made by the E-Rate Program in March, May and June 2003, long after Curtis filed his bankruptcy petition in his May 24,

2002 (See Docs. 1, 7, 8); Curtis received his discharge on July 23, 2003, soon after he received payment for the Westside contract. Since Curtis did not receive payments on the Westside contract until after he filed for bankruptcy, the payments did not affect the value of Curtis' Gen-I-Tech stock at the time he filed his bankruptcy petition on May 25, 2002, pursuant to 11 U.S.C. § 541. According to the "snapshot theory," the payments made to Gen-I-Tech, Inc. after Curtis filed for bankruptcy did not affect the value of his personal bankruptcy estate.

Again, it appears that Curtis did not intentionally conceal the proceeds of the Westside Alternative School contract from the bankruptcy trustee or his creditors because the only personal asset, the stock, was listed. Curtis had no obligation to list the corporate assets. Further, Curtis relied on the advice of his bankruptcy attorney, Willson, in not listing the money. If Smith had investigated by contacting Willson, Smith would have learned of the possible defenses to bankruptcy fraud outlined by Willson at the Section 2255 hearing, and would not have advised his client to plead guilty. But for Smith's error, the outcome of the proceeding would have been different. Therefore, Curtis has proven ineffective assistance of counsel in this respect, also.

### 3.

Finally, Curtis contends he did not have the fraudulent intent to conceal the Youth Challenge, Job Challenge, and Lafayette Christian Academy contracts from the bankruptcy trustee (Sutton) or his creditors because (1) the contracts were the property of Gen-I-

26

Tech, Inc, and not his personal property, and (2) the contracts did not exist until after he was discharged in bankruptcy.

Curtis disputed the factual basis for the guilty plea as to the contracts at his plea hearing, contending the Youth Challenge, Job Challenge and Lafayette Christian Academy contracts were not approved until after he received a discharge in bankruptcy, and there were no contracts on which he could have withheld information from the bankruptcy trustee (Doc. 43, p. 29). Curtis testified that the schools can back out of the "contracts" at any time before approval and the federal government can refuse to approve the "contracts," which happened with New Orleans school contract (Doc. 43, pp. 29-30). Hence, Curtis contends, he could not have had the requisite fraudulent intent to concea
l the contracts because there were no contracts to conceal. The district judge then proceeded to accept the guilty plea without objection by the defense attorney.

The federal E-Rate Program requires the schools and libraries to solicit competitive bids for work and submit the proposed contracts and certifications to the federal government. The government then pays a percentage of the cost directly to the contract provider, while the school pays the remainder, depending on the school's financial needs. U.S. v. Bokhari, 430 F.3d 861, 862 (7th Cir. 2005). The steps undertaken in this process were set forth in Alpha Telecommunications, Inc., 194 Fed.Appx. at 386, as follows:

> "In order for a school or library to participate in
> E-Rate, the school or library must engage in a highly

regulated application process. See [Overview of the Schools and Libraries Program, USAC, http:// www. univ ersalservice.or g/sl/about/over view-program.as px, (last visited May 25, 2006)]. First, the school or library must create a 'technology plan' and have the plan approved by a certified entity. ...Next, the school or library must file 'Form 470' with the USAC to begin the competitive bidding process. The USAC posts the school or library's request for services online. ...Thereafter, the school or library must wait 28 days before selecting a service provider. Id. In selecting a service provider, schools and libraries must make price the primary selection criteria. ...After selecting a provider, applicants must calculate their discount rate by using 'Form 471,' and submit Form 471 to the USAC. ...The USAC will review Form 471 and determine eligibility."

This discussion in Alpha Telecommunications, Inc. makes it clear that selection of the most cost-effective contractor's bid by a school and approval by the USAC create a contract with suspensive conditions.

Conditional obligations are made to depend on an uncertain event and, if the obligation is not to take effect until the event happens, it is a suspensive condition. La.C.C.art. 2021. The obligation contracted on a suspensive condition may depend, as in this case, on a future and uncertain event. La.C.C. art. 2043. The effect of suspensive condition is to suspend the obligation until the condition is accomplished or considered as accomplished. Until then, nothing is due. There is only an expectation that what is undertaken will be due. City of New Orleans v. Texas & P.Ry.Co., 171 U.S. 312, 333, 18 S.Ct. 875 (1989). The suspensive condition, under the Louisiana Civil Code, is the equivalent of the condition precedent at common law. City of New Orleans, 171 U.S. at 334, 18 S.Ct. at 883. The right to enforce the obligation does not arise

until the fulfillment of the suspensive condition, and the obligation may not be enforced until the condition is met. Washington Nat. Ins. Co. v. Brown, 654 So.2d 724 (La. App. 1st Cir. 1995), citing Pringle Assoc. Mortgage Corp. v. Eanes, 211 So.2d 399, 405 (La. App. 1st Cir.), writ den., 252 La. 887, 214 So.2d 715 (1968).

The reason and sense of the contemplated transaction, as it must have been understood by the parties and is to be collected from the whole contract, determines whether there is a suspensive condition or not; or it may be determined from the nature of the acts to be done, and the order in which they must necessarily precede and follow each other in the progress of performance. City of New Orleans, 171 U.S. at 334, 18 S.Ct. at 883.

In the case at bar, the approval of funding by the federal government for the construction contract between the school and its chosen contractor, in this case Gen-I-Tech, is clearly a suspensive condition to the contract. The contract specifically states that it will not take place unless federal funding is provided. Moreover, as demonstrated in testimony, if a project did not receive federal funding (such as the New Orleans school project), Gen-I-Tech did not have to perform the construction. As argued by Curtis, the school's eligibility and planned work, as well as the contractor's bid, must be approved by the federal E-Rate Program in order for funding to be approved. Since the contract was contingent upon federal approval and funding, there was no contract, no work done, and no account receivable prior to receiving federal approval and

funding.

The Job Challenge and Youth Challenge contracts were both offered into evidence at the hearing on Curtis' motion to withdraw his guilty plea (Exs. C and D). Both contracts, which were confected by Gen-I-Tech with Job Challenge and Youth Challenge, contained suspensive conditions that they are completely null and void if the federal E-Rate Program declined to fund them (see provisions 3, 4 of both contracts) or could be terminated at the "option of one party" (see provision 19 of each contract). Since federal funding was a suspensive condition which was required to make the Gen-I-Tech contracts enforceable, the date on which federal funding was approved was necessary to a determination as to whether Gen-I-Tech had an enforceable contract as of the date of Curtis' discharge in bankruptcy. If federal funding was not approved as of the discharge date, an enforceable contract did not exist at that time. If there was no enforceable contract, the value of the stock was not affected and there was nothing to reveal to the bankruptcy trustee. Clearly, this issue was determinative of guilt.

No evidence was adduced in the criminal proceedings (the January 2009 plea hearing, the May 7, 2009 hearing on the motion to withdraw the guilty plea, and the May 21, 2009 sentencing hearing), as to when the Youth Challenge, Job Challenge, and Lafayette Christian Academy contracts were approved and funded by the federal E-Rate Program, although it was clear they were eventually approved, performed, and paid. The government introduced a "Disbursement Summary" which showed the dates on which bills were made by the

customer and received by the E-Rate program and the dates on which payments were disbursed (Gov. Ex. 1).  Notably, all dates fall for billing, invoicing, and payments fall within 2004, after the **July 23, 2003** date of Curtis' discharge in bankruptcy.  Although Curtis and his defense attorney, Smith, raised this issue of when the contracts were approved for funding at the hearing to withdraw his guilty plea, Smith did not adduce any evidence as to the dates and did not subpoena Curtis' bankruptcy attorney, Willson, to testify. According to Curtis, Smith did not contact Willson, Curtis' bankruptcy attorney, despite the fact that Curtis was charged with bankruptcy fraud.

The government's disbursement summary for the Lafayette Christian Academy contract showed the funds disbursement dates all fell within 2004.  It is noted that the contract for the Lafayette Christian Academy was never introduced into evidence by the government, but the amounts Curtis received on the Lafayette Christian Academy were included in the amount he was found guilty of concealing for purposes of the sentencing guideline calculation.

The undersigned ordered the government to find out the dates Curtis' contracts were approved and funded by the E-Rate program. The evidence submitted (Docs. 78, 81) shows that the Youth Challenge, Job Challenge, and Lafayette Christian Academy contracts were not funded until after Curtis' discharge in bankruptcy; only the Westside Alternative School contract was funded prior to Curtis' bankruptcy discharge.  Curtis received his discharge in bankruptcy on July 23, 2003.  The federal funding commitments for the contracts

31

were as follows: Lafayette Christian Academy on October 21, 2003, Westside Alternative School on October 8, 2002, Youth Challenge Program on April 13, 2004, and Job Challenge Program on both November 18 2003 and March 30, 2004.

For clarity, the following dates are relevant:

*Form 471 filed by the school with E-Rate Program to apply for federal funding (following selection of service provider/Curtis):*

| | |
|---|---|
| Westside Alternative School | 1/17/2002 |
| Lafayette Christian Academy | 2/6/2003 |
| Youth Challenge Program | 2/6/2003 |
| Job Challenge Program | 2/6/2003 |

| | |
|---|---|
| *Curtis converted Chapter 11 to Chapter 7* | 2/12/2003 |
| *Curtis' discharge in bankruptcy* | 7/23/2003 |

*Federal funding commitments for the contracts:*

| | |
|---|---|
| Westside Alternative School | 10/8/2002 |
| Lafayette Christian Academy | 10/21/2003 |
| Youth Challenge Program | 4/13/2004 |
| Job Challenge Program | 11/19/2003 & 3/30/2004 |

The Youth Challenge, Job Challenge, and Lafayette Christian Academy contracts, were subject to a suspensive condition, federal funding, which did not come about until after Curtis' discharge in bankruptcy and thus were unenforceable until after discharge. This defense was not raised and argued by Curtis' attorney.

First, corporate assets were not required to be listed. Second, Curtis' attorney's failure to properly investigate the case resulted in his not discovering the dates the E-Rate program contracts actually became enforceable contracts; since the dates were after his bankruptcy discharge he had a complete defense against bankruptcy fraud as to those unenforceable contracts. Therefore, Curtis has shown his attorney failed to investigate the contracts Curtis was alleged to have concealed and that such failure

resulted in an actual and substantial disadvantage to the course of Curtis' defense.  Curtis's Section 2255 motion to vacate, set aside, or correct sentence should be granted on this ground.

<u>Guilty Plea Not Entered Knowingly</u>

Curtis contends his guilty plea was not entered knowingly.  The testimony at both the plea hearing and the Section 2255 motion showed that both Curtis and his attorney, Smith, were unaware that Curtis would be pleading guilty to concealing four contracts, believing instead that only the Westside Alternative School contract was involved.  When they discovered the other three contracts were included, Curtis disputed the existence of the Youth Challenge, Job Challenge, and Lafayette Christian Academy project at the plea hearing, arguing they were not approved, funded, or performed until after his discharge.  Curtis' arguments were not resolved and his guilty plea was accepted.

There was some evidence at the Section 2255 hearing that the trial prosecutor attempted to email and FAX discovery to Curtis' defense attorney, Smith, in October 2008, prior to entry of Curtis' guilty plea, and at least one attempt, if not all, failed to go through the FAX machine.  The defense attorney has no recollection of receiving discovery from the prosecutor in Curtis' case, his calendar and CJA voucher do not reflect receipt of discovery prior to Curtis' guilty plea, and the fact that Curtis and his attorney were completely unaware that Curtis was being charged with fraud as to contracts other than the Westside contract tends to indicate that, either they did not receive discovery prior to Curtis' guilty

plea, or Curtis' attorney did not look at the discovery prior to having Curtis enter a guilty plea.

Therefore, it appears Curtis was advised by his attorney to plead guilty prior to reviewing discovery documents and without any real understanding about what his client was pleading guilty to. If a defendant is represented by counsel and pleads guilty upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. Mangum v. Hargett, 67 F.3d 80, 84 (5th Cir.1995). Also, Hill v. Lockhart, 474 U.S. 52, 56,, 106 S.Ct. 366, 369 (1985). Curtis contends he never intended to plead guilty to concealing the other three contracts.

It is not effective assistance of counsel for an attorney to advise his client to plead guilty to charges which neither of them understands; understanding comes from some investigation of a case through discovery. Therefore, Curtis has shown that, but for his counsel's failure to apprise himself of the charges and evidence against Curtis prior to advising him to plead guilty, Curtis would not have pleaded guilty. Curtis has shown he had ineffective assistance of counsel.

### Defense of No Value to Contracts

Curtis contends his attorney failed to investigate and raise the defense that three of the Gen-I-Tech contracts, Youth Challenge Program, Job Challenge Program, and Lafayette Christian Academy, had no value both when he filed for and was discharged in bankruptcy.

As discussed above, the Youth Challenge Program, Job Challenge

34

Program, and Lafayette Christian Academy did not exist until after Curtis was discharged in bankruptcy, due to the fact that they were not been approved and funded by the E-Rate Program until after Curtis received a discharge.  Because they did not exist, they did not have a value.

Curtis' bankruptcy trustee, Mark Sutton, testified that he should have been informed of those contracts so he could determine whether they had value.  However, Sutton is not an attorney (he is a real estate agent) and admitted at the Section 2255 hearing that he would have had to seek the advice of legal counsel as to what he could do with those contracts, if anything.[8]  Sutton also admitted that he knew attorney Willson and had relied on Willson's reputation for bankruptcy knowledge and experience, as well as honesty, for the accuracy of Curtis' list of personal assets.  As already stated, Willson testified at the Section 2255 hearing that Curtis did not have an obligation to list the assets of Gen-I-Tech in his personal bankruptcy petition; Gen-I-Tech's contracts were not Curtis' personal assets, only the Gen-I-Tech stock was.  Therefore, Curtis never had an obligation to any of include Gen-I-Tech, Inc.'s

---

[8] Sutton testified/speculated that Gen-I-Tech's contracts had some value and could have been sold.  First, the contracts were not the property of the bankruptcy debtor's estate. Morever, it is highly unlikely anyone would have paid for a potential contract that had not yet been approved or funded by a third party and could be revoked by the other party to the agreement (the school board) at will.  Instead, the new potential contractor could simply apply to the school board to be the new contractor, and have their own contract approved for funding, without paying the old contractor anything at all.  Therefore, it was unrealistic to speculate that Gen-I-Tech's "contracts" could be "sold."

contracts in his personal asset list.

Had Curtis' defense attorney, Smith, familiarized himself with bankruptcy law, interviewed Curtis' bankruptcy attorney, or researched the contracts, he would have discovered the contracts had no value (and were not Curtis' personal assets). Smith admitted at the Section 2255 hearing that Curtis' case was his first bankruptcy case and that he told Curtis he did not want to try the case.

Finally, it is noted that Curtis was charged with concealing assets in his personal bankruptcy, but the evidence at trial related to Curtis' alleged failure to list Gen-I-Tech, Inc. assets (contracts) as his personal assets. Clearly, at some point, the criminal proceedings against Curtis went off track and the issue before the court somehow became whether Curtis committed bankruptcy fraud by failing to list Gen-I-Tech, Inc.'s corporate assets on his personal bankruptcy petition. Obviously, Curtis' defense attorney, Smith, did not appreciate that change and argue against it. The fact that the disputed issues at Curtis' district court hearings involved the alleged "concealment" of Gen-I-Tech contracts, for which he was found guilty and sentenced, demonstrates the lack of knowledge of bankruptcy law as it was explained by bankruptcy attorney Rocky Willson. Not only were the contracts the property of Gen-I-Tech, Inc. rather than Curtis personally, but the contracts (except for Westside) became effective (due to approval and funding) after Curtis was discharged in bankruptcy.

Therefore, Curtis' attorney's failure to raise the defense that three of the contracts Curtis was alleged to have concealed from his

bankruptcy trustee and creditors did not exist and did not have any value before Curtis was discharged in bankruptcy.  Therefore, Curtis has shown that, but for his counsel's errors, the result of the proceeding would have been different, and Curtis' Section 2255 motion should be granted.

<u>Sentence</u>

Next, Curtis contends he had ineffective assistance of counsel due to his attorney's failure to ask for a downward departure based on <u>Booker</u>,[9] with the help of expert witnesses at sentencing.  Curtis also contends his attorney advised him that his maximum exposure under the sentencing guidelines was six to twelve months, but he was sentenced to 37 months, resulting in a 25 month disparity between his advice and the sentence imposed.  Curtis alleges the disparity was due to his attorney's failure to stipulate to the amount concealed before Curtis entered a guilty plea, resulting in a point increase for a higher amount alleged by the government (as intended loss) than anticipated, and his failure to advise Curtis that the sentencing range would be higher due to having ten or more victims, his creditors (Doc. 54).

As discussed above, at the hearing on Curtis' Section 2255 motion, it became apparent that Curtis' attorney, Smith, did not review discovery materials (and may not have received them) prior to Curtis entering the guilty plea.  Smith apparently believed Curtis was only being charged with fraud as to the Westside

---

[9] The Supreme Court's opinion in <u>United States v. Booker</u>, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), rendered the U.S. Sentencing Guidelines are advisory only.

Alternative School contract, and was surprised when the other contracts came up at the plea hearing and in the presentence report. Curtis pleaded guilty, pursuant to a plea agreement, on January 12, 2009 (Doc. 24) and was sentenced to 37 months imprisonment (Doc. 35). Curtis' plea agreement states that failure of the sentencing judge to adhere to the sentencing recommendation shall not constitute a basis for setting aside the guilty plea. Essentially, after the presentence report was submitted, Curtis found himself facing a substantially longer sentence than he had anticipated. Curtis' counsel objected to the report on several grounds, all of which were reviewed by the district judge at the sentencing hearing. The sentencing guideline range was 37 to 46 months, with eligibility for probation, and the district judge imposed a sentence of 37 months imprisonment.

However, although Curtis contends his attorney was ineffective for misadvising him as to the sentencing range, he does not contend that, had he known he was facing a longer sentence, he would not have pleaded guilty. Therefore, Curtis has not shown that, but for his attorney's estimate that his sentence would be in the 6 to 12 months range, he would not have pleaded guilty and would have insisted on going to trial.[10]

Curtis also contends his attorney failed to present mitigating

---

[10] At least two courts in this circuit have found there is no ineffective assistance of counsel where the defendant's attorney has failed to warn of possible enhancements under the Sentencing Guidelines. <u>U.S. v. Curtis</u>, 2010 2l 610680 (M.D.La. 2010), citing <u>U.S. v. Collins</u>, 2009 wl 910842 (S.D.Miss. 2009), and <u>Thomas v. U.S.</u>, 27 F.3d 321 (8th Cir. 1994).

circumstances at the sentencing, citing traumatic family circumstances (the loss of his son, his brother, and his nephews), post traumatic stress, and deep depression (Doc. 54). However, at the sentencing, the district judge alluded to Curtis' recent life tragedies (Doc. 45, p. 26), indicating he was aware of them. The district judge also stated that Curtis was being sentenced pursuant to the Sentencing Reform Act of 1984 and <u>Booker</u> (Doc. 45, pp. 31-32). Therefore, Curtis has not shown he had ineffective assistance of counsel in this respect.

Finally it is noted that Curtis's sentence was affected by error in valuation of the Gen-I-Tech stock. Curtis was ordered to pay restitution to his creditors in the amount of $355,119 because Gen-I-Tech was paid a gross amount of nearly one million dollars on the four contracts, without considering the value of the Gen-I-Tech stock Curtis owned. However, the *net profit* on the contracts, and hence the valuation of the stock, was affected by the expenses incurred by Gen-I-Tech in fulfilling the contracts, i.e., expenses for sub-contracted work, materials, equipment, salaries, and other overhead. Moreover, the value of the stock was also affected by Gen-I-Tech's debts; in calculating the value of the Gen-I-Tech stock, the net profit on the contracts would have been offset by any debts Gen-I-Tech might have had. Therefore, the value of the Gen-I-Tech stock was not properly calculated by considering *only* the gross amounts paid on the four contracts, and it was error to assume the gross amount was available to pay Curtis' creditors.

It is also noted that Curtis' sentencing guidelines "offense

level calculation" in his presentence report, used to determine
Curtis' sentence, was increased by fourteen levels based on the
total gross amount paid to Gen-I-Tech, Inc. on the contracts,
resulting in a substantially higher sentencing guidelines range (a
fourteen level enhancement for a loss between $400,000 and
$1,000,000).  It appears to have been generally assumed by the
prosecution and the court that Curtis personally received the total,
gross amounts that Gen-I-Tech was paid by the E-Rate Program and the
schools on the four contracts, rather based than on the amount of
change in the value of Curtis' Gen-I-Tech stock.  Since any change
in the value of the Gen-I-Tech stock would take into account the net
profit to Gen-I-Tech (gross pay less amounts paid to subcontractors,
suppliers, laborers, overhead expenses including Curtis' salary, and
debts), the value of Curtis' Gen-I-Tech stock did not change by the
same amount as the total gross amounts paid by the federal E-Rate
program and the schools to Gen-I-Tech on the contracts.  The
valuation of Gen-I-Tech's assets arrived at by the prosecutor and
the court was based on the amounts paid to Gen-I-Tech under the four
contracts, as set forth in the presentence report; it was not based
on an audit of the company or any accounting of the assets and
debts. Bankruptcy attorney Willson testified that an audit of Gen-
I-Tech, Inc. was not made to place a value on Curtis' stock because
Gen-I-Tech, Inc. had few assets and little money when Curtis filed
for personal bankruptcy, and the audit would have been expensive.
It is clear that the sentencing guideline calculation was erroneous
due to the incorrect valuation of Curtis' stock.  This is yet

another area in which Curtis was not effectively represented by his attorney.

Curtis' attorney failed to raise these issues at or prior to sentencing, to Curtis' evident detriment.   Therefore Curtis had ineffective assistance of counsel in this respect, also.

### Pro Se Pleadings

Finally, Curtis contends his counsel was ineffective in requesting Curtis to do the legal research and draft critical motions, which were submitted to the court with only cosmetic changes (motion to withdraw guilty plea, sentencing memorandum, and addendum to the sentencing memorandum), despite the fact that Curtis has no legal training.   Standing alone, ineffective assistance of counsel is not demonstrated simply by permitting a client to research and draft his own pleadings, where the pleadings are reviewed and signed by the attorney.   The specific deficiencies in research and representation are addressed above under the pertinent issues.   Therefore, this ground for relief, standing alone, is meritless.

### Conclusions

Based on the foregoing discussion, IT IS RECOMMENDED that Curtis' Section 2255 motion be GRANTED and that his conviction and sentence be REVERSED AND VACATED.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may

respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2255 proceedings for the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 9th day of August, 2011.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE